Filed 8/29/14  In re Natalie T. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Natalie T., a Person Coming Under the Juvenile Law. | B252926 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>N.T.,<br><br>Defendant and Respondent. | (Los Angeles County Super. Ct. No. CK90631) |

APPEAL from orders of the Superior Court of Los Angeles County, Tony L. Richardson, Judge.  Reversed and remanded.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Appellant.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Respondent.

_____

In this dependency action (Welf. & Inst. Code, § 300),[1] the Los Angeles County Department of Children and Family Services appeals from section 366.26 orders that identified legal guardianship or foster care as the child's permanent plan. The appeal challenges the application of the parent-child relationship exception—also called the "benefit exception"—to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) The Department contends the trial court erred in finding the exception applies to this case. Based on our review of the record, we conclude the finding was premature, and we reverse and remand for further proceedings.

## BACKGROUND

Natalie T. was born in 2005 to Erika B. (Mother), who is not a party to this appeal, and respondent N.T. (Father). When Natalie came to the Department's attention in March 2010, she was riding with Mother in a stolen car that was driven by Mother's boyfriend, who crashed the car during a police pursuit. It is undisputed that Mother, who failed to secure Natalie in a seatbelt or child safety seat, had endangered Natalie. Mother was arrested and Natalie was released to Father's custody.[2]

The record contains almost no information concerning Natalie's relationship with Father prior to Mother's arrest. We infer, however, that Mother was the primary custodial parent based on the fact that Father, who lived apart from Mother in another city, took several weeks to enroll Natalie in school following Mother's arrest.

One month after Natalie was released to his custody, Father tested positive for drugs and entered an agreement with the Department to receive family reunification services. Natalie was placed with relatives while Father participated in a substance abuse

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2] The case against Mother was overwhelming and she does not challenge the findings against her. Accordingly, our discussion does not focus on Mother's role in this case.

2

treatment program. He was dismissed from the program after continuing to test positive for drugs.

The Department filed a section 300 petition on Natalie's behalf in November 2011, which alleged in relevant part that she was endangered by her parents' unresolved substance abuse issues. (§ 300, subd. (b) [failure to protect].) Initially, Natalie was placed in the care of a maternal aunt who lived in the home of the maternal grandmother (Grandmother). The Department later named Grandmother as Natalie's primary caregiver, and Natalie has been in her care throughout these proceedings.

In December 2011, the trial court sustained the section 300 petition and granted family reunification services and visitation to both parents. Father was ordered to participate in programs to address parenting, alcohol, and drug abuse issues.

At the six-month review hearing, Father was in minimal compliance with the case plan. Although he was enrolled in an outpatient substance abuse program, he was at risk of being terminated for poor attendance and missed drug tests. And although he had been allowed monitored visitation three times a week, he visited Natalie only about once a month.

At the time of the one-year review hearing, Father was enrolled in a residential treatment program, but was anxious to quit after only one month and without completing the program. Natalie was thriving in Grandmother's care; the Grandmother wanted to adopt her in order to provide her with a stable and permanent home. The Department recommended a permanent plan of adoption by Grandmother, whose home study for adoption had been approved. After finding that Father had not maintained regular contact with the child nor made significant progress in resolving the problems that led to her removal, the court terminated reunification services and scheduled a contested hearing for termination of parental rights. (§ 366.26.) The court granted Father a single five-hour monitored visit each week.

The Department's report for the section 366.26 hearing indicated that Father had been arrested in April 2013 for possession of a controlled substance, and had missed

3

several visits in May and June 2013. The report noted that Natalie loved living with Grandmother, who in turn loved Natalie and wanted to adopt her.

At the October 2013 section 366.26 hearing, Father called Natalie as a witness for the purpose of establishing the benefit exception to adoption (§ 366.26, subd. (c)(1)(B)(i)). She testified that she would like to live with Grandmother and visit Father on weekends, but if that was not possible, she would still like to be adopted by Grandmother. Grandmother is the adult in her life. It is she who talks to Natalie's teachers and takes her to school and to the doctor. Natalie likes visiting with Father because she enjoys going to "fun places" like Disneyland, Knotts Berry Farm, and Soak City, and buying things. After their visits, she misses him and wants "to stay with him a little longer." On the weekend before the hearing, she went to Sky Zone with her family, but Father did not go. He took her to buy a pet fish that she keeps at his house. When they got to his house, she played by herself with her toys. She is in third grade and does her own homework, which she never takes to Father's house. She would like Father to attend school events, but has never invited him to come.

Father's attorney argued that in light of Natalie's testimony, it would be in her best interest to preserve Father's parental rights and make Grandmother the legal guardian, thus ensuring that Father's visits will continue. Mother's attorney joined in this request.

Natalie's attorney disagreed. She contended there were no applicable exceptions to adoption, which was the appropriate plan in this case. She argued that Father had failed to make the required showing that terminating his parental rights would be detrimental to the child. Counsel stated that although Natalie had fun with Father, his visits were not regular and he has never played a parental role in her life. And she maintained that any incidental benefit that might be gained from the visits would not outweigh the substantial benefits that Natalie would receive from the permanency of adoption in a stable and loving home.

Counsel for the Department agreed with Natalie's attorney that the benefit exception had not been established in this case. He also asserted there was no indication that Grandmother would terminate Father's visits—which had become "somewhat

4

consistent and regular" during the latest period—once the adoption was finalized. He pointed out that even during Father's recent incarceration, Grandmother had allowed Father's relatives to take Natalie to visit him. He argued that any "emotional significance" that was attached to the visits would not outweigh the benefits that would result from the permanency of adoption.

Over the objections of counsel for Natalie and the Department, the trial court found the benefit exception applied because Father's recent visits were "as regular as they could be" during his incarceration, and Natalie wanted to continue their relationship. The court elected not to terminate parental rights and selected legal guardianship as the "less restrictive" placement plan. But Grandmother stated she did not want to be the legal guardian because Father was "not behaving well" and was returning Natalie from visits at midnight or 1 a.m. Grandmother requested that a third party handle the transfers so Father would be "committed to returning" Natalie at the scheduled time.

The court directed the Department to make any necessary changes to facilitate Father's visits. It also ordered the Department to prepare guardianship papers and "investigate where maternal grandmother stands on legal guardianship."

Natalie's attorney sought permission for Grandmother to address the court a second time because "we have not heard from her, that she's in agreement with the legal guardianship." The court denied the request, stating it had already allowed Grandmother to speak. When counsel replied, "[s]he's not done," the court stated, "[s]he is done because I said she's done. You are done because I said you are done." Counsel made one last effort, pointing out, "she's presenting information about . . . the safety of the child which I think is relevant for this court to hear." The court did not permit Grandmother to speak. It adhered to its decision to forgo adoption in favor of legal guardianship and directed counsel to present Grandmother's safety concerns "to the social worker."

At the continued section 366.26 hearing the following month, the court acknowledged that it had derailed Natalie's proposed adoption by Grandmother over the "strenuous objection—maybe that is putting it mildly—of the Department as well as

5

minor's counsel," and that Grandmother remained "adamant about adoption." After agreeing with the Department's counsel that Grandmother could not be forced to accept a legal guardianship, it granted a continuance to allow the Department to ascertain Grandmother's views as to legal guardianship and prepare a report of its findings. Because the order applying the benefit exception was left in place, the possibility of adoption was foreclosed. Seeking appellate review of that ruling, the Department timely appealed from the October and November 2013 section 366.26 orders. (§ 395 [post-judgment orders are appealable].)

## DISCUSSION

At the section 366.26 hearing, the court selects a permanent plan for the dependent child. Of the available options, "[a]doption is the preferred permanent plan. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1416.) Freeing a child for adoption requires termination of parental rights. '[I]n order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated.' (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250.)" (*In re Jasmine T*. (1999) 73 Cal.App.4th 209, 212.)

The benefit exception is one of the few grounds for not terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).) It "applies if termination of parental rights would be detrimental to the child because the 'parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Jason J*. (2009) 175 Cal.App.4th 922, 936.)

The parent has the burden of establishing the benefit exception by showing that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) The trial court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural

6

parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Id.* at pp. 575–576.)

On appeal, the Department contends the finding of detriment—which was made without allowing Grandmother "to explain whether she was interested in assuming legal guardianship over Natalie"—was erroneous and must be reversed. We agree that the failure to consider Grandmother's preference for adoption over legal guardianship was erroneous.

In order to reach an informed, intelligent and just decision, the trial court must know and consider the material facts and evidence, and apply the correct legal principles. (*Oldham v. California Capital Fund, Inc.* (2003) 109 Cal.App.4th 421, 430.) In this case, the parties agreed that some form of placement with Grandmother would be in Natalie's best interest. The question presented by Father's request to apply the benefit exception was whether the benefit of preserving his parental rights outweighed the benefit of providing Natalie with a permanent adoptive home with Grandmother, who did not want to be a legal guardian. When Grandmother attempted to raise a safety concern involving Father, who has a drug problem and was keeping Natalie out until midnight or 1 a.m., the court refused to hear her, stating, "She is done because I said she's done. You are done because I said you are done." Without considering the proffered information concerning the potential detriment that preserving Father's rights could pose to the child, the court rejected the preferred plan of adoption, thus narrowing the available options to legal guardianship or foster care.

Because the court failed to consider the material information that Grandmother was trying to present at the first section 366.26 hearing, the court's finding that

7

termination of parental rights would be detrimental to the child was premature. A new hearing is required so that all relevant and material evidence may be fully considered, and a determination made whether Father has met the considerable burden of proving the benefit exception.

A parent's burden of proving the benefit exception is not easily satisfied. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing relationship maintained during periods of visitation with the parent. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108 . . . .) The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically arise[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 [a two-hour monitored visit at a park or getting a bite to eat does not constitute the type of parental bond necessary to satisfy the benefit exception to adoption].) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

If preserving parental rights will threaten Natalie's stable and loving home with Grandmother, who does not wish to be a legal guardian because of recent difficulties with Father's visits, the court must weigh that negative factor against the benefit of preserving Father's visits. This is essential to an informed, intelligent, and just determination of the permanent placement plan that will best serve the child's interest. We therefore reverse the benefit exception finding as premature, and direct the Department to gather additional evidence regarding Grandmother's safety concerns and preferences as to the permanent

8

placement options of adoption, legal guardianship, and foster care.  After receiving such evidence, the court shall reconsider Father's request to apply the benefit exception.

## DISPOSITION

The section 366.26 orders are reversed and the matter is remanded for reconsideration of the benefit exception to adoption.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9